**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **09 CR 822-1** |
| | ) | |
| **EDWARD V. HORN,** | ) | **Judge Milton I. Shadur** |
| **Defendant.** | ) | |

**DEFENDANT EDWARD HORN'S SENTENCING MEMORANDUM AND**
**OBJECTIONS TO PSR**

Now comes Defendant **EDWARD HORN**, by and through his attorney **PATRICK E.**

**BOYLE**, and respectfully requests, pursuant to 18 U.S.C. Section 3553(a), Rita v. United States,

127 S.Ct. 2456 (2007), and United States v. Booker, 543 U.S. 220 (2005), that this Honorable

Court impose a sentence below the applicable advisory guideline range, because such a sentence

is sufficient, but not greater than necessary, to comply with the purposes of sentencing in 18

U.S.C. Section 3553(a).  In support of this request, Mr. Horn submits and files with this

Honorable Court, his Sentencing Memorandum and Objections to the PSR as follows:

**I.      Edward Horn's Objections to the Pre-Sentence Report**

Edward Horn seeks to correct and clarify several representations made by the U.S.

Probation Office in the original and supplemental Pre-Sentence Reports presented to this Court.

In the original PSR of March 22, 2010 it is claimed on page 2 that Mr. Horn had a Georgia

drivers license and a Georgia State ID – Mr. Horn denies that he ever had a Georgia drivers

license or a Georgia State ID.  On the same page, the PSR states that Mr. Horn has no

dependants – in fact, Mr. Horn has three children who he has helped raise and has supported

throughout their lives.

In lines 18-20 of the original PSR it is claimed that Mr. Horn's first court appearance was

October 15, 2009 when in fact it was October 16th.  In lines 53-58 the PSR quotes Mr. Horn's

wife Priscilla's summary of what Edward told her as an explanation for his conduct that led to

the instant offense.  The PSR states that Mr. Horn told Priscilla that he engaged in the fraud in a

"moment of weakness."  In fact, Mr. Horn told Priscilla that he had engaged in the fraud as a

result of severe depression, the abuse of prescription drugs and because he was facing desperate

financial circumstances including the impending foreclosure of their home.

      In lines 68-70 of the original PSR, Inspector Rossman claims that Mr. Horn declined to

speak to investigators regarding his actions.  Mr. Horn asserts that he was never questioned by

the investigators regarding his specific actions and in fact he has consistently admitted his

wrong-doing and there has never been any allegation that he obstructed justice in any way in this

case.

      In lines 171 to 175 of the original PSR, a domestic battery arrest is summarized by

Probation apparently based on allegations in an arrest report.  In fact, there was no physical

violence in the case, it was a mere verbal argument, Edward and Priscilla have reconciled, and

the case will be dismissed as is Priscilla's wishes.

      In lines 180-192 of the original PSR, an allegation of disability fraud is made against Mr.

Horn and it is claimed that he received approximately $150,000 to $180,000 in disability

payments from an insurance company.  Mr. Horn asserts that he did suffer a significant injury,

his disability claim was legitimate, he received approximately $110,000 (not the amount claimed

in the PSR) and that he has never been charged with any criminal conduct in relation to this

disability claim.

      In lines 202 to 209 of the original PSR certain alleged facts are claimed concerning a

theft charge from Georgia against Mr. Horn.  Mr Horn denies all of these "facts" which are not

true, are all hearsay, were never proven or even alleged in court and asks the Court to note that

all charges were dismissed.

In lines 216-217 the original PSR notes that Mr. Horn, at the age of nine, was sexually

assaulted by an adult neighbor, "the nature of which he declined to provide."  Mr. Horn did not

decline to speak about this terrible, traumatic incident, rather the Probation officer chose not to

pursue this issue or question Mr. Horn regarding the details of this incident.  Mr. Horn would

have spoken in detail regarding this incident because he feels that it greatly influenced his life.

He was sexually abused at a very young age and never felt comfortable enough to share this

horrible incident with his parents.  It inevitably created a connection between sexual activity and

secrecy and a lack of trust that has affected Mr. Horn and he has raised this issue in the

psychological treatment and counseling that he has received and hopes to continue with.  On this

point, the PSR at lines 335 to 344, discusses Mr. Horn frank admissions that he suffers from

depression, anxiety and stress and that he desires mental health counseling and treatment as part

of his sentence from this Court.  Mr. Horn also desires in-patient drug treatment and counseling

as part of his sentence recommendation as is stated in lines 387 to 389 of the PSR.

In the original PSR, Mr. Horn's employment history is summarized and it is claimed that

he has not been engaged in any gainful activity in the past 3 years.  That is not strictly true, while

the PSR correctly notes that because of the economic downturn and the tough economic

conditions in Michigan business has been slow, Mr. Horn does want the Court to know he has

been working in his trade of home rehabilitation to the best of his ability.

In lines 443 to 458 of the original PSR, Mr. Horn's alleged "unsecured debts" are set

forth.  Mr. Horn does not recognize a $58,368 debt allegedly owed to "Real Time Resolutions"

and also denies that he has any unpaid civil judgement from Georgia as claimed in line 447.

Mr. Horn contends that despite the Probation Officer's conclusion that he "has no information concerning the offense or the defendant which would warrant a departure" there are several factors which will be discussed below that would warrant a downward departure in this case. Finally, of course, Mr. Horn objects to Probation's conclusions in the Supplemental Report that he is now not entitled to an offense level reduction despite his timely acceptance of responsibility and guilty plea.

## II.   Edward Horn's Sentencing Request

Edward Horn is now a 57-year-old man. For the first 44 years of his life, he was a married, proud father of three children. He had worked his entire life as a building contractor, a trade he learned from his father. He had never committed any crimes and had never been arrested. However, in 1996, Mr. Horn, following several traumatic events, was suffering from severe depression and began the abuse of prescription drugs and committed his first crime, a fraud. Mr. Horn accepted responsibility for the offense, pled guilty, and successfully served his sentence and his period of supervised release. Mr. Horn then tried to rebuild his life to the best of his ability. However, many of the psychological and emotional factors that led to his first offense had not be properly addressed or resolved. Caught up in a unhealthy and destructive relationship and still in the grip of drugs, Edward attempted to perpetrate another desperate, preposterous fraud that led to his charge in this case. The fraud was fortunately unsuccessful, which was hardly surprising considering its nature, and Edward accepted responsibility for his actions and entered into an almost immediate written guilty plea to the charged offense.

According to the written guilty plea it was anticipated by the parties that the offense level would be 18, which, when combined with the anticipated criminal history category of II, would

result in an advisory Sentencing Guidelines range of 30 to 37 months' imprisonment. Because of an irresponsible, reckless and stupid mistake made while on pre-sentence release, Mr. Horn's offense level reduction for his acceptance of responsibility is now in jeopardy. The government now argues that Mr. Horn's offense level is 21, he is now in criminal history category III, and his applicable advisory Sentencing Guideline range is 46 to 57 months. Mr. Horn believes that despite the mistakes his made following his guilty plea he should still be entitled to acceptance of responsibility, a criminal history of category III overstates his criminal history, and that after considering all of the Section 3553(a) factors, this Court will conclude that a sentence below the range of 30 to 37 months imprisonment would be sufficient but not greater than necessary.

III.     **Legal Standard: Sentencing Below Guideline Range Post-Booker**

        In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court made the Sentencing Guidelines effectively advisory. As a consequence, the federal sentencing statute still "requires a sentencing court to consider Guidelines ranges, . . . , but it permits the court to tailor the sentence in light of other statutory concerns as well . . ." Booker, 125 S. Ct. At 756-57. The Guidelines calculations are to be treated "as just one of a number of sentencing factors." United States v. Ranum, 353 F.Supp.2d 984, 985-87 (E.D.Wis.2005). The Ranum court rejected the notion that the Guidelines must be afforded heavy weight and concluded that "courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the Section 3553(a) factors." Ranum, 353 F.Supp.2d at 987-89. The Section 3553(a) factors include:

        (1) the nature and circumstances of the offense and the history and characteristics of the

5

defendant;

> (2) the need for the sentence imposed -
>> (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (b) to afford adequate deterrence to criminal conduct;
>> (c) to protect the public from further crimes of the defendant; and
>> (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the advisory guideline range;

> (5) any pertinent policy statements issued by the Sentencing Commission;

> (6) the need to avoid unwarranted sentence disparities, and

> (7) the need to provide restitution to any victims of the offense.  18 U.S.C. Section

3553(a).

Most importantly, Section 3553(a) directs the court, after considering these factors, to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in" sub-section (a)(2).  *Id*.  This is the so-called "parsimony provision," which requires district courts to impose the minimum term required to satisfy the purposes of sentencing – just punishment, deterrence, protection of the public and rehabilitation of the defendant.  *See, e.g.*, United States v. Cull, 446 F.Supp.2d 961, 963 (E.D. Wis. 2006); *see also* United States v. Ferguson, 456 F.3d 660, 667 (6th Cir. 2006) (stating that the parsimony provision serves as "the guidepost for sentencing decisions post-Booker).

In Rita v. United States, 127 S.Ct. 2456 (2007), the Supreme Court forbade district courts from according a presumption of reasonableness to the guidelines.  Rita, 127 S.Ct. At 2465 ("The sentencing court does not enjoy the benefit of a legal presumption that the Guidelines

sentence should apply.") The Seventh Circuit has likewise held that district courts are not "permitted . . . to presume that a sentence within the Guideline range is the correct sentence," United States v. Demaree, 459 F.3d 791, 794 (7th Cir. 2007), and that district courts "must sentence based on Section 3553(a) without any thumb on the scale favoring a guideline sentence," United States v. Sachsenmaier, 491 F.3d 680, 684 (7th Cir. 2007).

It is now clear that this Court has broad discretion to sentence below the advisory guideline range.  See, United States v. Ngatia, 477 F.3d 496, 501-02 (7th Cir. 2007)("The district's court's choice of sentence, whether inside or outside the guideline range, is discretionary and subject therefore to only light appellate review.") In fact, a district court judge's "freedom to impose a reasonable sentence outside the range is unfettered," United States v. Demaree, 459 F.3d 791, 795 (7th Cir. 2007), and the Seventh Circuit will scrutinize a district court's refusal to grant a reduction below the range, United States v. Vaughn, 433 F.3d 917, 924 (7th Cir. 2006).  The Seventh Circuit confirms that a sentence below the advisory guideline range is appropriate as long as the reasons for selecting that sentence "are rooted in Section 3553(a), sufficiently individualized to the circumstances of the case, and generally associated with sentencing leniency."  United States v. Wachowiak, 496 F.3d 744, 748 (7th Cir. 2007).  A below-guideline sentence will be deemed reasonable on appeal if "the sentencing judge has given meaningful consideration to the sentencing factors enumerated in Section 3553(a)," id., and if the sentence "is adequately reasoned in light of the Section 3553(a) factors," United States v. Wallace, 458 F.3d 606, 609 (7th Cir. 2006); see also, United States v. Cunningham, 429 F.3d 673, 675-76 (7th Cir. 2005).

7

**IV.    Edward Horn's History and Characteristics, and the Circumstances of the Offense**

As is set forth in the PSR, Edward Horn grew up in a stable, but emotionally distant

family.  With the benefit of hindsight, it is clear that Edward's parents suffered from untreated

depression and possible alcoholism.  While Edward did not suffer any physical or mental abuse

at home, he was sexually molested by an elderly neighbor.  This was Edward's first sexual

experience and an extremely traumatic one.  He was ashamed and embarrassed and he did not

feel that he could tell his parents.  Consequently, Edward did not discuss this horrible event with

anyone but a local minister who really did not provide any help.  Despite this, Edward was a

responsible young man and a good son who graduated from high school.  His father had his own

building contractor business and Edward began working with him and learned the trade.  He was

employed by his father from 1971 to 1981 and then he began his own contracting business in

1981.  He was a respected and consistent worker and throughout his adulthood and was able to

provide for his family.  Edward met the love of his life Priscilla and they were married in 1981.

Edward and Priscilla have three children who are all stable and successful individuals currently

attending college.  Edward respectfully requests that this Court consider the support letters that

were provided by his family.

For the first 44 years of his life, until 1995-96, Edward was a stable, productive and

respected member of the community who had never been even arrested or charged with any

wrong-doing.  However, as set forth in the PSR, several traumatic events resulted in Edward

falling into a severe depression and the resultant abuse of prescription drugs.  (PSR at lines 304

to 334) Edward pled guilty to a charge of fraud, served his sentence and successfully completed

his period of supervised release.  Edward was reunited with his family, went back to work and

8

tried to rebuild his life.  Following the September 11, 2001 terrorist attacks, Edward provided, at

great personal risk, information concerning domestic terrorism to his local FBI office.  Edward

did the best he could, but he still had unresolved issues concerning depression, anxiety, and the

abuse of prescription medications.  In June of 2007, Edward made the horrible decision, while

clearly not thinking rationally, to attempt another fraud upon an insurance company.  The facts

of the offense are set forth in the plea agreement that Edward entered into.  Frankly, the facts of

the offense suggest the actions of a desperate, irrational man, not those of a coherent or

sophisticated scheme to defraud.  Following his guilty plea, Edward submitted his version of the

offense to Probation and it is attached to the original PSR.  Edward respectfully requests that this

Court consider this as an explanation for his commission of this crime and for further evidence

of his remorse and acceptance of responsibility.  Fortunately this attempted fraud was

unsuccessful and the insurance company did not lose any money.  While recognizing that

pursuant to U.S.S.G. Section 2B1.1(b)(1)(H) the offense level is increased by 14 levels because

of the amount of the *intended* loss just as if there had been an *actual* loss, Edward does ask the

Court to consider the fact that there was no actual loss when judging the reasonableness of the

advisory guideline range in this case.  If this Court considers all of the factors concerning

Edward's mental health and the abuse of prescription drugs, it would be reasonable to conclude

that these factors significantly diminishes his culpability and mitigates the circumstances of the

offense under Section 3553(a)(1).

      While the Government has submitted literally hundreds of pages of documents to the

Court (the vast majority of which have nothing to do with the offense that Mr. Horn pled guilty

to) in an effort to cast him in the most unfavorable light possible, Mr. Horn just asks the Court to

consider his many years of decent, law-abiding conduct and the eloquent support letters of his

family.  Further, when interviewed by Probation, Priscilla Horn stated that she "believes her

former husband to be a very devoted family man, whose absence, should he be sentenced to

prison, will be greatly felt, especially by their children."  (PSR at 272-275) Children are to any

parent, their truest legacy, and Edward Horn's children speak to his and Priscilla's parenting.

They are all well-adjusted and successful and all currently attending college.  Finally, Edward's

mother, who is elderly and in poor health, states in her support letter that Edward was always her

most responsible child and she needs his support and care.

## V.  Edward Horn is Entitled to Acceptance of Responsibility

Following his arrest, Edward was placed on home confinement which was monitored by

an electronic ankle bracelet.  Edward was doing well, attending mental health counseling at the

Eastwood Clinic in Dearborn, Michigan.  (See PSR at lines 351-362) All of Edward's pre-trial

services reports were positive and all of his drug tests were negative.  (PSR at lines 38-40)

However, Edward violated the trust of this Court, made a serious mistake and engaged in

misconduct that resulted in the revocation of his pre-trial release and his being taken into custody

and held at the old Kankakee County Jail awaiting sentencing.  In essence, Edward was given

permission by this Court to travel from his home in Michigan to visit his brother in Georgia.

Edward did visit his brother in Georgia but on the way back he stopped a visited a woman in

Missouri that he had met on Facebook.  The Government has filed numerous documents with

this Court concerning this event and Edward apologized in open court and in a letter to this

Court for his conduct.  There is no question that Edward made misrepresentations about who he

was and what his resources were.  Thinking that Edward was rich, the woman in Missouri sent

Edward bills totaling over $30,000 for her psychotherapy and requested that he pay them.  She introduced her realtor friend to Edward and it was her idea for him to look at a mansion in Missouri.  She hoped that Edward would then give her this mansion for her to live in and her realtor friend would also make a handsome commission.  Edward made the offer on the home despite having no intention of buying it to save face and impress this woman.  There was never any possibility of the home owner being defrauded and Edward immediately withdrew the offer and returned home to Michigan with deep regret and embarrassment.  Edward knows what he did was wrong and feels great remorse and shame for his reckless, irresponsible actions but he does want this Court to know that he never had any intention of defrauding anyone or obtaining any money or property by false pretenses.

The Government has repeatedly referred to Edward's acts as "criminal."  The Government argues, and that argument is echoed in the Supplemental PSR, that these "criminal" acts mandate the forfeiture of Edward's acceptance of responsibility.  Edward has no desire to rationalize or minimize his behavior, but the simple fact is, that however wrong or irresponsible his actions were, they were not criminal.  No laws were broken, no criminal charges were made (nor could be made) and Edward had no criminal intent.  There is no question that Edward violated the trust of this Court in going beyond his permitted travel.  However, these actions should not result in Edward losing his acceptance of responsibility.

In the original PSR it is noted that "during the course of the presentence investigation, the defendant has never denied any of the actions, for which he has pled guilty, nor to any of the actions alleged in the indictment and government's version.  The defendant has also acknowledged his responsibility of his actions in the instant offense, through his guilty plea, as

well as his written plea agreement." (PSR at lines 91-94) Referring to the defendant's version of

the offense that Edward submitted to Probation, the PSR states "conveys that he, the defendant,

is deeply remorseful of his actions, which he now knows to have been wrong, and is accepting of

the consequences of his actions."  (PSR at 75-76) The written plea agreement between the parties

acknowledged Mr. Horn's timely and authentic acceptance of responsibility which permitted the

government to avoid any trial preparation and stated the anticipation that Mr. Horn would

receive a 3 level reduction of his offense level.  Because of Mr. Horn's misconduct while

awaiting trial the Government now argues that he does not deserve acceptance of responsibility.

In its pleadings on this issue the Government cites several cases where acceptance was not given

by the sentencing court because despite a guilty plea.  However, all of these cases are

distinguishable from Mr. Horn's because they all involve continuing actual criminal conduct

and/or obstruction of justice.  For example, in United States v. Sellers, 595 F.3d 791 (7th Cir.

2010), the defendant did not receive acceptance of responsibility because it was learned that the

defendant had called his wife and told her to warn an accomplice that the police were on to their

drug enterprise and further that he had a violent fight with another prisoner while awaiting

sentencing.  Both acts were actually criminal and the phone call to the wife could have supported

an obstruction of justice charge.  Here, while Mr. Horn's actions were shameful and regrettable,

they were not criminal and were certainly not evidence of obstruction of justice.  If the Court

was not satisfied on April 28, 2010 that he was deserving of acceptance of responsibility when it

revoked Mr. Horn's bond it can be confident now that he has fully accepted responsibility for his

actions.  Mr. Horn's misconduct carried a very severe penalty.  Instead of being home with his

wife and children and elderly mother preparing for his sentencing, he has been held at the old

12

Kankakee County Jail.  He has been forced to reflect on his actions and mistakes.  He feels

terrible for the decisions he had made and has apologized to this Court and his wife.  This is not

the kind of case that would call for the extremely rare denial of acceptance of responsibility to a

defendant who has consistently admitted his wrong-doing and pled guilty.  Consequently, this

Court should conclude that the offense level is 19 and hopefully the Government will honor the

plea agreement and move for an additional 1 point reduction for Mr. Horn's timely guilty plea

and extensive post-plea cooperation making the offense level 18.

**VI.  Edward Horn is Deserving of Consideration for Extensive Cooperation**

In its sentencing memorandum, the Government begrudgingly admits that Edward Horn

has provided the Government, on several separate occasions, information and cooperation.

Curiously, the Government states that the cooperation is "unverified" despite having it

confirmed to the government by its own agents.  Prior to providing information and subjecting

himself to interviews at great personal risk, Mr. Horn has not requested or received any

guarantees of Government consideration.  Despite this, Mr. Horn has done what he felt was right

and provided truthful and significant information in the hope of preventing future crimes or

injuries to innocent parties.  Of course, the decision of whether to make a 5K1.1 motion, despite

extensive cooperation of a defendant, rests entirely within the discretion of the government and

Edward accepts this.  However, in its analysis of the Section 3553(a) factors, this Court can and

should consider such cooperation even in the absence of a 5K1.1 motion by the government,

especially here, where the Government is challenging even the acceptance of responsibility.  In

United States v. Milne, 384 F.Supp.2d 1309 (E.D. Wis. 2005), the district court, noting the post-

Booker "greater flexibility to fashion sentences that fit the circumstances of the case," granted

additional consideration to a defendant who demonstrated acceptance beyond that necessary to

obtain the reduction under Section 3E1.1 in the absence of a 5K1.1 motion.  The Milne court

reasoned that this is so because such conduct bears directly on the defendant's character (Sect.

3553(a)(1)) and how severe a sentence is necessary to provide deterrence and punishment (Sect.

3553(a)(2)).  id at 1312.  Further, courts should encourage offenders to mitigate their misconduct

voluntarily as Edward did here by admitting it – such admissions and acceptance of

responsibility are the first and best steps toward rehabilitation and avoidance of future offenses.

See also, United States v. Knox, 573 F.3d 441, 453 (7th Cir. 2009) (stating that "as a general

matter, a district court may consider a defendant's cooperation with the government as a basis

for a reduced sentence, even if the government has not made a 5K1.1 motion).

## VII.   Edward Horn's Criminal History

In the written plea agreement, the parties agreed that Edward had 3 criminal history

points which put him in a criminal history category of II. (Plea agreement p. 6) A subsequent

plea to a misdemeanor offense in Michigan results in an additional point that takes Edward into

criminal history category III.  Mr. Horn is a fifty-seven year old man.  These are the only cases

that provide criminal history points to him.  This is not a defendant who has an extensive

criminal history or numerous arrests that did not result in convictions.  Although the Government

makes numerous allegations concerning uncharged "criminal" conduct or refers to incidents that

were dismissed, if anything, a criminal history category of III overstates Edward's criminal

history.  Consequently,  it would be reasonable for this Court to conclude that his criminal

history is overstated and reduce his category to a level II pursuant to Section 4A1.3(b).  While

"departures are obsolete . . .the district court may apply those departure guidelines by way of

14

analogy in analyzing the Section 3553(a) factors."  United States v. Miranda, 505 F.3d 785, 795

(7th Cir. 2007)

## VIII.  Credit for Time Served in Pre-Trial Custody

Following his arrest on October 15, 2009, Mr. Edward Horn was initially placed on 24

hour/day home confinement enforced by an electronic ankle monitor and that should certainly be

considered as pre-trial custody or detention.  On April 28, 2010, this Court revoked this "bond"

and ordered that Mr. Horn be remanded into custody where he has remained since that date.

Consequently, Mr. Horn respectfully requests that this Court make it part of its sentencing order

or by way of a separate minute order to the BOP that he receive credit for 270 days served.

## IX.  Consideration for Edward Horn's Incarceration in the Old Kankakee County Jail

This Court should consider the fact that Edward Horn has been held, despite being a

federal detainee, at a county facility, the old Kankakee County Jail.  The old Kankakee County

Jail, located in the heart of the city of Kankakee, Illinois, is the oldest facility in the pretrial

detention system provided for inmates in the Northern District of Illinois.  Many defendants have

brought to the district court's attention the conditions which have been characterized by many

inmates as substandard or onerous, including but not limited to:

   a.  lack of medical or psychological care;
   b.  shortage of adequate clothing or bedding;
   c.  unsanitary living conditions;
   d.  the absence of any educational classes, recreational programs, or activities;
   e.  no substance abuse programs;
   f.  no work opportunities;
   g.  total indoor lock-down and no opportunity to be outdoors or to exercise;
   h.  no library facilities;
   I.  no exercise equipment;
   j.   no chapel or religious facilities;
   k.  inadequate electricity and plumbing; and
   l.  walls that are cracking, peeling, and leaking.

In <u>United States v. Pressley</u>, 345 F.3d 1205 (11th Cir. 2003) the court approved a departure based on the length of pretrial detention and on the conditions present in the facility. In <u>United States v. Francis</u>, 129 F.Supp.2d 612, 616(S.D.N.Y. 2001), the court granted a downward departure because of the defendant's 13-month pretrial confinement in a county facility that subjected the defendant to extraordinary stress and fear that resulted in weight loss, stress, insomnia, and depression. A similar result is justified here and the Defendant respectfully requests a downward departure based on his placement in this substandard, county facility.  It is anticipated that the Defendant may desire to supplement this request with an 11 page motion that the Defendant drafted himself and he would ask leave to do so.

## X.  Conclusion and Sentencing Recommendation

Mr. Edward Horn respectfully requests that this Court accept his arguments concerning his acceptance of responsibility, extensive cooperation, criminal history category, and all of the other  factors justifying a below guideline sentence.  Moreover, because the sentencing guidelines are advisory, Mr. Horn requests, pursuant to 18 U.S.C. Section 3553(a), <u>Rita</u>, and <u>Booker</u>, that this Court exercise its discretion and impose a below guideline sentence which reflects the seriousness of the offense, the need for specific and general deference, the need to avoid unwarranted sentencing disparities, as well as the age and other characteristics of the defendant.  Such a sentence would fully comply with the dictates of section 3553(a) while being fair, just and merciful.  Mr. Horn further requests that this Court recommend that he be placed in

16

the BOP's  residential drug treatment program as part of his sentence and that this Court

recommend that he serve his sentence at FCI Milan, Michigan so that he will be near his family.

Respectfully submitted,

**EDWARD HORN,**

By:     s/ Patrick E. Boyle_____
        By his attorney Patrick E. Boyle

Law Offices of Patrick E. Boyle
**PATRICK E. BOYLE**
155 N. Michigan Ave., Suite 562
Chicago, IL 60601
(312) 565-2888

### CERTIFICATE OF SERVICE

The undersigned Attorney certifies that the following Sentencing Memorandum was served on **Thursday July 8, 2010**, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

By:     s/ Patrick E. Boyle
        PATRICK E. BOYLE

Law Offices of Patrick E. Boyle
**PATRICK E. BOYLE**
155 N. Michigan Ave., Suite 562
Chicago, IL 60601
(312) 565-2888